UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GRETCHEN W. CARLSON,

    Plaintiff,

v.

WASHINGTON DEPARTMENT OF HEALTH, et al.,

    Defendants.

CASE NO. C07-0681RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the parties' cross-motions for summary judgment (Dkt. ## 33, 38). The court finds oral argument unnecessary in light of the unusual posture of this action. For the reasons stated below, the court GRANTS Defendants' motion (Dkt. # 33) in part, DENIES it in part, and DENIES Plaintiffs' motion. By December 10, 2008, the parties shall provide a joint statement as described at the conclusion of this order.

## II. BACKGROUND

On February 1, 2007, the Washington Medical Quality Assurance Commission ("MQAC") received an anonymous complaint about Dr. Gretchen Carlson, a psychiatrist. MQAC is the entity responsible for enforcing Washington's Uniform Disciplinary Act

ORDER – 1

("UDA"), RCW Ch. 18.130, against Washington physicians. RCW 18.71.019. The complaint, handwritten on a standard MQAC form, stated as follows:

> It is a fact that Dr. Gretchen Carlson is a psychiatrist. It is a fact that [John Doe] was and is a patient of Dr. Carlson. [John Doe] lives in Bellevue. It is a fact that Dr. Carlson and [John Doe] are having a sexual relationship. It is a fact that [John Doe] is staying with Dr. Carlson in her residence in Kirkland.

Kagan Decl. (Dkt. # 36), Ex. A. The complainant referred to herself only as "Anonymous," and provided no information about herself.[1] *Id.* The only other information she provided was Dr. Carlson's name, the address of her office, and an estimated age of the patient with whom she allegedly had sexual contact. *Id.*

Based solely on this information, MQAC authorized an investigation into the complaint against Dr. Carlson.[2] Sexual contact between a physician and a patient is unprofessional conduct proscribed by the UDA. RCW 18.130.080(24). Dr. Carlson now concedes that MQAC followed the proper procedural steps to initiate an investigation of the complaint, although she disputes that MQAC had sufficient evidence to investigate.

The Washington Department of Health ("DOH"), which provides investigators to MQAC (RCW 18.130.060(4)), assigned Tim Slavin to the investigation. On March 7, 2007, Mr. Slavin sent a letter to Dr. Carlson explaining that the MQAC had received the complaint, and had commenced a "preliminary investigation." Kagan Decl., Ex. A. He requested a written narrative from Dr. Carlson explaining her relationship with John Doe, and explaining when their physician-patient relationship began and ended. *Id.* He also

---

[1] The gender or the anonymous complainant is unknown. For simplicity, the court will arbitrarily use feminine pronouns to refer to the complainant.

[2] Defendants did not reveal to Dr. Carlson that they received the anonymous complaint against her via facsimile. The faxed complaint contained the fax number from which it was sent and the notation "Valley Supply." Dr. Carlson did not discover this until Defendants filed the full complaint in this court on July 30, 2007. 1st Slavin Decl., Ex. 1. Dr. Carlson traced the fax number on the complaint to a construction supply company in Redmond. Taylor Decl. Her investigation has revealed nothing about who faxed the complaint. There is no indication that Defendants ever investigated the fax number, and the court therefore assumes that they had not done so when MQAC authorized an investigation of the complaint.

ORDER – 2

requested that she provide a complete copy of John Doe's medical records. *Id.* He requested a response within 14 days. *Id.*

Shortly after Mr. Slavin sent the letter, the DOH received an anonymously-mailed envelope containing what Mr. Slavin contends were John Doe's medical records for his treatment at Dr. Carlson's office. 2d Slavin Decl. ¶ 3. Mr. Slavin had not requested the records from anyone other than Dr. Carlson. *Id.* ¶ 4. No one has any idea who sent the records to DOH.

Mr. Slavin contacted Dr. Carlson's counsel to inform him that he had received the medical records. Kagan Decl., Ex. C. Counsel insisted that neither Dr. Carlson nor anyone she authorized had sent the records to DOH. *Id.* Counsel demanded to see the records. *Id.* Mr. Slavin declined to provide them.

In a March 26 letter, Dr. Carlson's counsel wrote Mr. Slavin and asserted that Dr. Carlson was being stalked, and that the stalker may have made the anonymous complaint and sent John Doe's medical records. Kagan Decl., Ex. D. After further attempts to obtain the records in DOH's possession were unsuccessful, counsel wrote a letter to DOH counsel asserting that DOH's refusal to release the records in its possession made it "complicit with the stalker" and put Dr. Carlson at greater risk. Kagan Decl., Ex. F.

Mr. Slavin declined to give Dr. Carlson the records he had received; Dr. Carlson declined to cooperate with his investigation. On April 10, 2007, he wrote a letter reiterating his requests for a narrative and John Doe's records. Kagan Decl., Ex. G. When Dr. Carlson failed to comply, Mr. Slavin issued a subpoena to Dr. Carlson for John Doe's medical records. 2d Slavin Decl., Ex. 1.[3]

Dr. Carlson sued DOH, the DOH Secretary, and Mr. Slavin in King County Superior Court in mid-April, 2007. She asserted that the UDA did not permit MQAC to authorize an investigation based on the information before it. She also asserted a replevin

---

[3] It is not clear which court has jurisdiction to enforce the subpoena; there is no indication that it is this court.

ORDER – 3

claim to force Defendants to give the anonymously-mailed medical records to her. Finally, she brought a host of claims asserting violations of the United States and Washington Constitutions.

Defendants (a state agency, a state official, and a state investigator) removed the case from state court to this court. Once it arrived here, it was assigned to the Honorable James L. Robart.

On September 5, 2007, Judge Robart held a hearing on the parties' cross-motions for protective orders. The court granted those motions in part, imposing several restrictions. First, the court limited discovery to determining whether MQAC had followed proper procedural steps in authorizing an investigation of Dr. Carlson. Transcript of Sept. 5 hearing (Dkt. # 28) (hereinafter "Tr.") at 19-20. Second, the court prevented Defendants from using discovery in this action to supplement its ongoing investigation of Dr. Carlson. Tr. at 21. The court emphasized, however, that it was not "prohibiting in any manner the [Defendants] from requesting the information from Dr. Carlson, or other . . . individuals or entities pursuant to the administrative process." *Id.* Finally, he ordered Defendants to file the medical records it received anonymously under seal with the court. Tr. at 22. The court reasoned that Defendants had means to obtain medical records directly from Dr. Carlson, eliminating the need to rely upon anonymously-received records that could have been stolen or fabricated. *Id.* Defendants provided the medical records to the court in four sealed envelopes on September 13, 2007. Dkt. # 27. Those records remain sealed in the court's possession.

After this comparative flurry of activity by the parties, it appears that Defendants have abandoned their investigation of Dr. Carlson, and that, but for this court's prompting, the parties have also abandoned this lawsuit. From September 2007 to April 2008, neither party took any action in this court. So far as the court is aware, the parties neither pursued the resolution of this action nor the resolution of Defendants' investigation of Dr. Carlson. So far as the court is aware, Dr. Carlson has not complied

ORDER – 4

with Mr. Slavin's requests for a narrative statement and John Doe's records. As of May 27, 2008, Dr. Carlson had not complied with the subpoena. 2d Slavin Decl. ¶ 7.

Noting the parties' apparent disinterest in pursuing this matter, the court issued an April 11, 2008 order (Dkt. # 30) requiring the parties to explain why the court should not dismiss this action for want of prosecution. The parties responded (Dkt. # 31) by requesting leave to file the motions for summary judgment now before the court. In the more than seven months since the April 11, 2008 order, there is still no indication that Defendants have pursued their investigation of Dr. Carlson.

As the court will discuss, Defendants' failure to pursue the investigation of Dr. Carlson means that most of the parties' disputes in this action are not ripe for resolution.

### III. ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).

In this case, the court need not resolve any factual disputes, as the parties raise no disputes over the facts necessary to the court's ruling. This order resolves only questions of law, on which the court does not defer to either party. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

ORDER – 5

A. **MQAC Had Sufficient Information to Commence an Investigation.**

Although Dr. Carlson now concedes that MQAC followed appropriate procedure in commencing its investigation, *see Client A v. Yoshinaka*, 116 P.3d 1081, 1086-87 (Wash. Ct. App. 2005) (discussing procedural requirements for initiating investigation), she disputes that MQAC had sufficient evidence to authorize an investigation. Specifically, she contends that MQAC violated RCW 18.130.080:

> If the disciplining authority determines that a complaint submitted under subsection (1) of this section merits investigation, or if the disciplining authority has reason to believe, without a formal complaint, that a license holder or applicant may have engaged in unprofessional conduct, the disciplining authority shall investigate to determine whether there has been unprofessional conduct. In determining whether or not to investigate, the disciplining authority shall consider any prior complaints received by the disciplining authority, any prior findings of fact under RCW 18.130.110, any stipulations to informal disposition under RCW 18.130.172, and any comparable action taken by other state disciplining authorities.

RCW 18.130.080(2). She argues that the uncorroborated anonymous complaint that MQAC received, in conjunction with her spotless prior disciplinary record, did not permit MQAC to authorize an investigation.

The plain language of the UDA permitted MQAC to authorize an investigation based on the information it had in February 2007. It had received a "complaint" within the meaning of RCW 18.130.080(1)(a), and nothing in the statute suggests that the anonymous nature of the complaint is relevant. Contrary to Dr. Carlson's suggestion, nothing in RCW 18.130.080(2) restricts MQAC's determination that a complaint "merits investigation." Indeed, it would appear that upon receipt of a complaint, MQAC can conclude that it "merits investigation" for any reason, or for no reason at all. Only where MQAC acts "without a formal complaint" does the statute explain that it "shall" investigate if it "has reason to believe . . . that a license holder may have engaged in unprofessional conduct." Even assuming, however, that the "reason to believe" standard

ORDER – 6

applies when MQAC has received a complaint, the court has no difficulty concluding that the anonymous complaint gave MQAC "reason to believe" that Dr. Carlson "may have engaged in unprofessional conduct" by having sexual contact with a patient. Although the anonymous complaint might not suffice to *convince* anyone that she had sexual contact with a patient, it would give any reader "reason to believe" that she may have done so. The complaint names Dr. Carlson, identifies the patient by name, and alleges that the patient lives with Dr. Carlson. This is more than enough detail to give reason to believe that Dr. Carlson may have acted unprofessionally. The court has reviewed the complaint, and despite Dr. Carlson's spotless prior disciplinary record, the complaint gives the court reason to believe that Dr. Carlson may have engaged in unprofessional conduct. The MQAC did not violate the UDA by authorizing an investigation after coming to the same conclusion.

No court has considered what standard, if any, applies to a disciplinary entity's authorization to investigate under RCW 18.130.080(2). In *Yoshinaka*, the one decision touching upon the issue, the court interpreted the statute in accordance with its plain meaning. The *Yoshinaka* court was concerned with UDA procedure, but noted in passing that "an investigation against a [health care provider] may not proceed until the [disciplinary authority] reviews the complaint and determines that there are *reasonable grounds* to believe unprofessional conduct occurred." 116 P.3d at 1086 (emphasis added). This statement is dicta, and the *Yoshinaka* court had no need to expound on it. There is no basis to suspect, however, that requiring "reasonable grounds" is different than requiring "reason to believe" that unprofessional conduct may have occurred.

When the plain language of a statute is unambiguous, as it is in this case, "it is not subject to judicial interpretation and its meaning is derived from its language alone." *State v. Glas*, 54 P.3d 147, 150 (Wash. 2002). Because Dr. Carlson advances an interpretation of RCW 18.130.080(2) at odds with its plain meaning, the court addresses and rejects her interpretation of the statute.

ORDER – 7

Her primary attack is that the "merits investigation" or "reason to believe that a license holder . . . may have engaged in unprofessional conduct" language in the UDA imposes a standard akin to the probable cause requirement of Fourth Amendment jurisprudence. As an initial matter, the court notes that had the legislature intended to impose a probable cause standard, it no doubt would have said so. The legislature has used the phrase "probable cause" in more than 150 Washington statutes. Many are criminal statutes that use the phrase in the context in which it is most relevant. *E.g.*, RCW 9.73.130, RCW 9A.16.040, RCW 10.31.060. But the legislature often imposes a probable cause standard in civil settings as well. *E.g.*, RCW 6.62.060(1) (permitting garnishment where "there is probable cause to believe that the alleged ground for garnishment exists"), RCW 7.48.320 (allowing recovery of costs for agricultural nuisance investigations initiated "without probable cause"), RCW 11.24.050 (permitting assessment of costs against a will contestant "unless it appears that the contestant acted with probable cause"). The legislature has also imposed the standard in at least one professional discipline context. RCW 18.27.104(1) (requiring a contractor to cease unlawful advertising upon receipt of an administrative order supported by "probable cause"). When the legislature intends to impose a probable cause standard, it says so. Its failure to do so when drafting RCW 18.130.080(2) is a significant blow to Dr. Carlson's interpretation of the statute.

Moreover, because authorizing an investigation does not implicate the interests ordinarily protected by a probable cause standard, the standard is neither practically nor constitutionally necessary. The probable cause requirement protects persons from unreasonable searches or seizure within the meaning of the Fourth Amendment. By contrast, when MQAC or another disciplinary authority authorizes an investigation, it does not authorize any search, seizure, or any other event that implicates the Fourth Amendment. *After* the investigation is authorized, the investigator may make choices that implicate the Fourth Amendment. In this case, for example, Mr. Slavin could have

ORDER – 8

expended his investigative resources trying to track down the anonymous complainant to determine if her complaint was reliable. If he had done so, he would not have conducted any search or seizure of Dr. Carlson. He chose instead to target Dr. Carlson's medical records, a choice that raises constitutional concerns, as the court will later discuss. But the mere authorization to investigate, as required by RCW 18.130.080(2), raises no constitutional concerns.

Dr. Carlson's analogies between her circumstances and criminal investigations are poorly drawn. When a police officer seeks to search a person or his property, the Constitution demands that he obtain a warrant supported by probable cause in some cases, probable cause but no warrant in other cases, and only a reasonable articulable suspicion in others. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968) (describing varying Fourth Amendment standards). But Dr. Carlson can cite no authority for the notion that the Constitution demands anything before an officer begins to investigate. As to the Fourth Amendment, the lack of authority is to be expected, because the Fourth Amendment is not concerned with investigations generally, but rather with a narrower class of conduct that constitutes a "search" or "seizure." The same is true of the Fourth Amendment analogue to the Washington Constitution: Article I, Sect. 7. Like the Fourth Amendment, it prohibits only disturbances of a citizen's private affairs or unwarranted invasions into his home. It is not concerned with investigations, which are at best a possible precursor to events that could implicate the Fourth Amendment.[4]

The plain language of the UDA permits MQAC to initiate investigations provided it has *any* reason to believe a physician acted unprofessionally. As the court has just

---

[4] Dr. Carlson's reliance on *Ortega v. O'Connor*, 146 F.3d 1149 (9th Cir. 1998), only reinforces the difference between an investigation and events to which the Fourth Amendment applies. The *Ortega* court held that a hospital's administrative *search* of a physician's office and *seizure* of "certain romantic mementos" found there was a violation of the Fourth Amendment. *Id.* at 1150. The *Ortega* court did not discuss what standard, if any, applied to the hospital's decision to commence an "investigation into [the physician's] management practices." *Id.* The court implicitly approved of the investigation; it disapproved of the methods employed during the investigation. *Id.* at 1163 ("There are far better and more productive ways of investigating . . . without intruding unduly on constitutionally protected rights.").

ORDER – 9

noted, neither the Washington Constitution nor the federal Constitution limit MQAC's authority to initiate an investigation. As a practical matter, there is ample reason interpret the investigatory statute, in accordance with its plain language, to require only a reason to believe unprofessional conduct occurred before investigating. The purpose of an investigation is to obtain evidence, and Washington citizens would be ill-served by an investigatory regime that required MQAC to lock away its investigatory tools until it had the evidence that those tools would help elicit. Faced with a complaint that Dr. Carlson had committed unprofessional conduct, MQAC did what is expected of an agency designated to police physicians: it decided to authorize an investigation. In so doing, it violated neither the UDA nor the Washington or federal Constitutions.

**B.  Although Mr. Slavin's Attempts to Obtain Information from Dr. Carlson Raise Constitutional Concerns, the Concerns Are Not Ripe for Adjudication.**

### 1.  Dr. Carlson's Fourth Amendment Claims Are Either Unripe or Without Merit.

Although MQAC's authorization of an investigation of the complaint against Dr. Carlson raises no constitutional concerns, Mr. Slavin's subsequent actions do. Although nothing required him to do so, Mr. Slavin used his investigatory authority to seek Dr. Carlson's records of her treatment of John Doe. He first "requested" the records from Dr. Carlson. He repeated the request in several letters, occasionally invoking RCW 18.130.180(8). Kagan Decl., Exs. A (Mar. 7, 2007 letter), G (April 10, 2007 letter). That statute explains that failure to cooperate with a request for a narrative or documents from a disciplinary authority is itself unprofessional conduct:

> [Unprofessional conduct includes] [f]ailure to cooperate with the disciplining authority by:
>
> (a)  Not furnishing any papers, documents, records, or other items;

ORDER – 10

>    (b)   Not furnishing in writing a full and complete explanation
>          covering the matter contained in the complaint filed with the
>          disciplining authority . . . .

RCW 18.130.180(8). The UDA also authorizes MQAC to fine physicians for failure to provide records in response to a "request" from an investigator. RCW 18.130.230.

In addition to the power to "request" statements and medical records from a physician, the UDA authorizes investigators to use civil discovery to obtain the same information. An investigator can subpoena documents and notice depositions. RCW 18.130.050(4)-(5). On May 1, 2007, Mr. Slavin invoked this option, issuing a subpoena to Dr. Carlson for John Doe's medical records. 2d Slavin Decl., Ex. 1.

Unlike MQAC's decision to investigate Dr. Carlson, Mr. Slavin's decision to "request" and subpoena records implicates the Fourth Amendment and its Washington analogue. An administrative subpoena for records does not require a warrant, but the Fourth Amendment requires it to be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (quoting *See v. City of Seattle*, 387 U.S. 541, 544 (1967)). The right of a person served with a subpoena to challenge it in court before compliance serves as an adequate safeguard of his or her Fourth Amendment rights. *Id.*; *see also Reich v. Mont. Sulphur & Chem. Co.*, 32 F.3d 440, 448 (9th Cir. 1994) (describing Fourth Amendment standard for administrative subpoena).

It is not enough, however, that Mr. Slavin's actions raise Fourth Amendment concerns; his actions must also threaten to invade Dr. Carlson's Fourth Amendment rights. Both the Constitution and prudential considerations prevent a court from adjudicating a dispute that is not yet ripe. *Alaska Right to Life v. Feldman*, 504 F.3d 840, 849 (9th Cir. 2007). Article III of the Constitution limits federal courts' jurisdiction to actual "cases" or "controversies," and the ripeness doctrine ensures that where no violation of the law has yet occurred, there must be evidence that a violation is imminent.

ORDER – 11

*Id.* (discussing three factors relevant to determination of Article III ripeness). In addition, the court should consider prudential factors, including "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *Id.* (internal citation omitted).

There is no ripe Fourth Amendment dispute arising from Mr. Slavin's "requests" or his subpoena. Ordinarily, the mere existence of the subpoena and Mr. Slavin's request for documents and a narrative[5] would be sufficient to establish a concrete threat. But, as the court has noted, Mr. Slavin has done nothing to enforce either his requests or his subpoena in more than 18 months. As to his "requests," there is no indication that he is attempting to pursue them. On April 10, 2007, he reiterated his requests to Dr. Carlson, and she has apparently not complied with them. His decision to use a subpoena suggests that he perhaps abandoned his "requests" in favor of a more formal approach. But he has not attempted to enforce the subpoena in this court or, so far as the record reveals, in any other court. As a prudential matter, the existence of a subpoena suggests that disputes over its enforcement ought to be decided on a proper challenge to the subpoena in a proper court. When the court last addressed the parties in September 2007, it stated that this action should not impede Defendants' investigation of Dr. Carlson. Tr. at 21. For reasons not apparent from the record, Defendants appear to have abandoned their investigation. On these facts, the court cannot conclude that any violation of Dr. Carlson's rights under the Fourth Amendment or its Washington analogue is imminent.

Dr. Carlson does present one Fourth Amendment claim that is ripe for review: her contention that Defendants' retention of the anonymously-mailed medical records is

---

[5] The court notes that Mr. Slavin's "request" that Dr. Carlson provide a narrative describing her relationship with John Doe potentially implicates the Fifth Amendment's bar on compelled self-incriminating testimony. The Fifth Amendment applies in professional disciplinary proceedings that threaten the respondent with "the loss of professional standing, professional reputation, and . . . livelihood . . . ." *Spevack v. Klein*, 385 U.S. 511, 516 (1967) (holding that Fifth Amendment applies in attorney discipline proceeding). Although she makes a passing reference to her "right to remain silent," Pltf.'s Mot. at 2, Dr. Carlson never invoked the Fifth Amendment in response to Mr. Slavin's requests.

ORDER – 12

unconstitutional. This claim is meritless. Dr. Carlson does not have a shred of evidence that the records were obtained as the result of Defendants' unlawful search or seizure. Neither Defendants nor Dr. Carlson has any idea, on the record before the court, of the provenance of the records. Absent evidence that Defendants acquired the records in a manner that implicates the Fourth Amendment, their retention of the records is not a constitutional violation. Dr. Carlson's reliance on *United States v. Numisgroup Int'l Corp.*, 137 F. Supp. 2d 139 (S.D.N.Y. 2001), is wholly misplaced. That case centered on an allegation of illegal seizure of documents by a "government agent" and subsequent retention of the documents. *Id.* at 147. There is no indication that any government agent had any role in seizing the anonymously-mailed records from Dr. Carlson.

### 2. Dr. Carlson's Due Process Claims Are Also Unripe.

Dr. Carlson also invokes the Fourteenth Amendment's Due Process Clause and its analogue in Article 1, Section 3 of the Washington Constitution. She argues that Dr. Slavin's requests and subpoena impinge on John Doe's right to privacy in his medical records.[6] Courts recognize a dual privacy interest in medical records. *Whalen v. Roe*, 429 U.S. 589, 599 (1977). The first is an individual's interest in avoiding disclosure of personal information to the government. *Id.* The second is an interest in avoiding government interference with personal decisions. *Id.* Both interests, however, give way to state regulatory programs that require limited disclosure of patient information with appropriate protections of their privacy. In *Whalen*, for example, the Court rejected a Fourteenth Amendment[7] challenge to a New York statute that required physicians to

---

[6] Although third parties ordinarily lack standing to assert the rights of others, physicians have standing to protect the privacy rights of their patients. *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965).

[7] The *Whalen* Court grounded its discussion of patient's privacy rights solely in the Fourteenth Amendment's Due Process Clause. 429 U.S. at 604 n.32. The court acknowledged that the Fourth Amendment also protects a privacy interest, but only against "affirmative, unannounced, narrowly focused intrusions . . . ." *Id.* The Fourth Amendment protects privacy to the extent that it is threatened by searches or seizures; the Fourteenth Amendment protects privacy more broadly.

ORDER – 13

divulge to a state agency the names of patients to whom they prescribed certain dangerous drugs. *Id.* at 603-04; *see also Peninsula Counseling Ctr. v. Rahm*, 719 P.2d 926, 936-37 (Wash. 1986) (upholding, under federal Constitution, statute requiring disclosure of mental health patient information to permit tracking of social services funding); *Murphy v. Washington*, 62 P.3d 533, (Wash. Ct. App. 2003) (upholding statute permitting state pharmacy board to conduct warrantless searches of pharmacy records over federal and state constitutional privacy objections). In *Yoshinaka*, the court found that the UDA contains sufficient protections to ensure that private patient information obtained in disciplinary investigations is neither improperly obtained nor improperly disclosed. 116 P.3d at 1086-87.

Ignoring binding federal and Washington precedent, Dr. Carlson relies heavily upon *Bd. of Med. Quality Assurance v. Gherardini*, 156 Cal. Rep. 55 (Cal. App. 1979), in support of her privacy claim. In that case, the court held that an administrative subpoena to a hospital for five patient records that averred only that the disciplinary authority was investigating a charge of physician incompetence was insufficient to overcome the patients' privacy rights. *Id.* at 57, 62-63. The court relied on a provision of the California Constitution as well as federal precedent. *Id.* at 63. To the extent that *Gherardini* is grounded in California's constitution, it is of no assistance in interpreting either the Washington Constitution or the United States Constitution. And, as the court has already noted, federal precedent finds that health care regulations may require the disclosure of patient information to regulators in the furtherance of legitimate state interests. Washington courts have read Washington's constitutional privacy protections to be no broader. *Murphy*, 62 P.3d at 540 (concluding that Washington constitution provides "no more extensive privacy protections" for medical records than the United States Constitution).

Ultimately, the court need not decide whether Defendants' request or subpoena for medical records violates anyone's Due Process rights; like Dr. Carlson's Fourth

ORDER – 14

1  Amendment Claims, this one is not ripe for review. Defendants' failure to pursue the
2  investigation of Dr. Carlson for more than eighteen months means that there is no
3  concrete threat of an invasion of John Doe's due process rights.[8]

### C. The Parties Must Determine What, if Anything, Remains of This Action.

This order dispenses with Dr. Carlson's challenge to MQAC's initiation of an investigation against her. What remains of this action is unclear.[9] Are Defendants still pursuing an investigation? Have they done anything to further the investigation in the past eighteen months? Do they intend to pursue Dr. Carlson's medical records as well as written testimony from her regarding her relationship with John Doe?

The court directs the parties to meet and confer to discuss the answers to these questions as well as a more fundamental question: does this dispute belong in this court? For reasons unknown, it appears that the mere pendency of this action has derailed Defendants' investigation of a charge of unprofessional conduct against a physician. The court has no idea whether Dr. Carlson engaged in unprofessional conduct. The court strongly prefers, however, that the allegations against her be resolved expeditiously. If Dr. Carlson has engaged in unprofessional conduct, the public is best served by Defendants taking appropriate action. If she has not, then Dr. Carlson is best served by disposing of this inquiry. No one is served by allowing this action to languish further in this court.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS Defendants' motion for summary judgment (Dkt. # 33) to the extent it seeks dismissal of Dr. Carlson's claim that they

---

[8] Defendants devote a portion of their briefs to attacking the notion that Dr. Carlson has a substantive due process right to have consensual sexual contact with a patient, akin to the right established in *Lawrence v. Texas*, 539 U.S. 558 (2003). Nowhere does Dr. Carlson suggest that she is making such a claim, so the court declines to address it.

[9] This order does not resolve Dr. Carlson's replevin claim. Ordinarily, the court would dismiss the claim, because Dr. Carlson has offered neither facts nor legal authority establishing her entitlement to the records in Defendants' possession. Defendants, however, expressly declined to address the replevin claim.

ORDER – 15

violated RCW 18.130.080 in initiating an investigation of the complaint against her. The court DENIES the motion in all other respects, and also DENIES Dr. Carlson's motion (Dkt. # 38). Dr. Carlson has expressly abandoned any claim based on a denial of procedural due process, and the court therefore dismisses that claim as well.

No later than December 10, 2008, the parties shall submit a joint statement addressing the current status of the investigation of Dr. Carlson, including the enforcement of the subpoena for John Doe's medical records. The parties shall also inform the court of what, if anything, Defendants have done to pursue the investigation. The parties shall either agree to dismiss this action without prejudice, or shall demonstrate that there are ripe disputes between the parties. To the extent there are such disputes, the parties shall propose a means of adjudicating them either by motion or otherwise.

DATED this 24th day of November, 2008.

The Honorable Richard A. Jones
United States District Judge

ORDER – 16